## Draper License

*Austin Norris*, for appellant.

*R. C. Wisner*, for Liquor Control Board.

LEVINTHAL, J., August 9, 1950.—This matter is before us on appeal from an order of the Liquor Control Board revoking the liquor license of the Hotel LaReve on the ground that the licensee maintained a "disorderly house". The parties have agreed to submit the testimony before the board's examiner as the entire evidence to be considered de novo.

On June 27, 1949, the board issued its citation no. 424 charging the licensee with operating a "house of

assignation". A hearing was held on this charge on September 28, 1949, and the board properly decided that the evidence did not sustain that charge. On October 10, 1949, the board issued its citation no. 659 charging the licensee with the operation of a "disorderly house", and at the last hearing counsel for both parties agreed to try the issues on the record developed at the September hearing.

The testimony indicates that at 9:15 p.m., on May 21, 1949, two officers of the vice squad, Smith and Braxton, visited the licensed premises at Ninth Street and Columbia Avenue, Philadelphia. The liquor bar is located on the first floor, and the hotel registration desk is on the second floor. Smith went to the registration desk and told the employe in charge that he had just called his "girl friend". The registrar told him to wait until she got there and then to bring her in. Smith waited five minutes, during which time two couples, unaccompanied by baggage, entered and registered. He then descended to his car across the street opposite the hotel door, and continued his observations until 10:45 p.m. During that time seven couples were seen to enter the hotel and four couples to depart from it, all without baggage. Braxton also observed the hotel from the parked car, and made the same observations as Smith. On June 5, 1949, at 1:50 a.m., these two officers raided the hotel, and as a result of the questioning of 10 couples found in separate rooms, determined that nine were not married to each other, although they had registered as man and wife.

We do not consider the several technical defenses raised by the licensee to have any substantial merit. It is not true that in order to sustain the charge that the hotel was a "disorderly house", the board must prove that there was a public nuisance by reason of external physical disturbances or by reason of gam-

bling or prostitution. There is, of course, no validity to the argument that because the Liquor Control Board failed to sustain its first citation charging the licensee with maintaining a "house or assignation", and also because Draper, the coöwner of the licensed hotel, was acquitted by a jury in the criminal court of a charge of maintaining a "bawdy house", the board should have dismissed the second citation, now before us, in which the maintenance of a "disorderly house" is the charge levelled against the licensee. "A disorderly house" has been judicially defined to include "a public hotel, the proprietor of which knowingly, openly and indiscriminately rents its rooms for the purpose of fornication . . .": Commonwealth v. Hartung et ux., 156 Pa. Superior Ct. 176, 179 (1944). In that case, the court concluded that although the evidence could not support a criminal conviction of keeping a bawdy house, it did sustain the conviction of maintaining a disorderly house. While the instant proceeding is under the Liquor Control Act and not under our Criminal Code, the elements of the definition of a "disorderly house" are identical. The considerations of protecting public morals are of equal scope in the administration of both our penal and our regulatory laws. It is obvious that the corruption of public morals is not affected by the presence or absence of commercialism in the practice of unlawful, indiscriminate sexual intercourse. If the licensee knowingly, openly and indiscriminately permitted the LaReve Hotel rooms to be used for purposes of fornication, even though there were no prostitution involved, the license should be revoked.

The contention that the search and seizure of June 5, 1949, was illegal and that the evidence received as a result of the raid should be suppressed because no warrant was produced at the hearing, is altogether untenable. Assuming that no warrant was actually is-

sued, it cannot be said that, in the light of the circumstances, the search was "unreasonable". Furthermore, even if the evidence were gathered in an unlawful search and seizure, it is nevertheless admissible in the courts of Pennsylvania to prove a violation of law: Commonwealth v. Dugan et al., 143 Pa. Superior Ct. 383 (1940); Commonwealth v. Davis, 163 Pa. Superior Ct. 224 (1948).

Dismissing these several technical defenses, as we must, we nevertheless are of the opinion that the liquor license of the hotel should not have been revoked by the board. Viewing all the testimony as a whole, we are satisfied that the charge in the citation has not been established. There must be more than mere suspicion of wrongdoing to warrant the revocation of a hotel liquor license.

Officer Smith's testimony as to the statements made to him by the occupants of the hotel rooms, to the effect that they were not married to each other, was clearly hearsay and inadmissible. Officer Braxton's testimony, however, indicates that Louis J. Draper, a part owner of the hotel, was present when the patrons of the hotel rooms told him they were unwed. It is contended that since Mr. Draper remained silent, the roomers' admissions were admissible in evidence against him, for silence of an accused person is a tacit assent to the truth of what is said in his presence: Commonwealth v. Vallone, 347 Pa. 419 (1943). The question we must consider is whether the circumstances were such that an ordinary man in the position in which Mr. Draper found himself would then and there deny the correctness of the statements made by the roomers. It must be remembered that ". . . the inferences of assent may safely be made only when no other explanation is equally consistent with silence": Smith et ux. v. American Stores Company, 156 Pa. Su-

perior Ct. 373, 379 (1945). In Commonwealth v. Coyne, 115 Pa. Superior Ct. 23 (1934), defendant did not respond when introduced to a lady as "one of the bosses" of a gambling house. The court, in holding that the silence of defendant could not be construed as an admission by him that he was one of the owners of the establishment, declared, at page 25, "a failure to deny a statement made in one's presence and hearing will be construed to be a tacit admission of its truth only when it is made in such circumstances, and by such persons, as naturally to call for a denial, if one does not intend to admit it. Silence is considered an admission, only when the circumstances are such that one ought to speak and does not." The majority opinion of the Supreme Court in the Vallone case, supra, points out that "ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt". In that case, a girl whom defendant transported for the purpose of prostitution related the whole experience to officers in his silent presence. If the statements by the roomers in the instant case had been that Draper knew they were unwed, then his silence would clearly make the officer's testimony admissible. But what the roomers actually said to the police officer was that they had falsely registered as man and wife. The silence of Draper may be attributed to shocked astonishment rather than to assent to the truth of the statements.

Even if we should find that Braxton's testimony is competent and admissible, we believe it is not entitled to much weight. As was said by our Supreme Court in Moore v. Smith, 14 S. & R. 388 (1826), at page 393: ". . . Nothing can be more dangerous than this kind of evidence. It should always be received with caution . . ." Moreover, in Commonwealth v. Manuszak et al.,

155 Pa. Superior Ct. 309 (1944), it was held that although evidence of defendant's assenting silence, in the face of an accusation of guilt, is admissible, it is corroborative only, and must be supported by other evidence of guilt.

In the instant case, there is no substantial corroborative evidence to support the charge that the licensee knew that unwed couples were using the hotel rooms for the purpose of fornication. The testimony as to the couples entering and leaving the premises on the night of May 21, 1949, was neutral and of no evidentiary value. It was a Saturday evening, and most of the couples may well have gone to and from the bar on the first floor rather than to the hotel rooms upstairs. Similarly, the brief conversation between Officer Smith and the hotel employe, relied upon by the board as tending to indicate that a man and an unwed "girl friend" would be permitted to take a room, does not constitute substantial corroborative testimony. The employe might perhaps have understood that the officer was waiting for his wife. Furthermore, the employe's reply to the officer was equivocal. No room was actually given to Smith prior to the appearance of his "girl friend". The employe might well have intended to observe the female first and to question her, as well as her companion, in order to decide whether they were actually married to each other, before permitting the couple to take a bedroom.

The fact that most of the couples who had registered as man and wife at the time of the raid of June 5th, were not accompanied by baggage is a suspicious circumstance, but is not at all conclusive of the licensee's guilt. The testimony in the case clearly establishes that the patrons of this hotel were exclusively Negroes, that it is customary for the men as well as the women engaged in domestic service in the suburbs

to join their spouses for one night a week in some hotel in the city, and that it would be unreasonable to require these people to have baggage with them under those circumstances.

The evidence does not support a finding that the licensee knowingly, openly and indiscriminately rented the hotel rooms for the purpose of fornication and thus maintained a disorderly house. While the charge need not be proved beyond a reasonable doubt, it must be established by a fair preponderance of the evidence. This has not been done. The order of the Liquor Control Board is therefore reversed.